## Taylor Motor Sales Company v. Automobile Insurance Company, of Hartford, Conn.

(Decided February 1, 1927.)

### Appeal from Pike Circuit Court.

1. Sales.—Bill of sale by automobile sales agency, accompanied by delivery of automobile to purchaser, held prima facie to constitute a sale and not a bailment, though purchaser was to pay in monthly installments and automobile was to remain property of seller until paid for.

2. Sales.—Conditional sale, accompanied by delivery of personal property, passes title to purchaser with lien to seller for unpaid price.

3. Insurance.—Evidence of bill of sale providing for deferred payments and delivery of automobile, giving purchaser full control thereof, held to show a sale and possession of automobile by one as purchaser, under partial payment plan, and not that of bailee of seller within fire insurance policy, denying seller coverage on cars in hands of purchaser under partial payment plan.

G. R. BLACKBURN for appellant.

HARMAN, FRANCIS & HOBSON for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

This is a suit by the Taylor Motor Sales Company against the Automobile Insurance Company, of Hartford, Conn., to recover $1,100.00, the amount of a fire policy on an automobile destroyed by fire. The case was tried in equity without objection and judgment rendered for defendant. Plaintiff has appealed. The parties to the record will be referred to hereafter as appellant and appellee.

Appellant runs a garage and automobile sales agency at Stone, Ky.; it being alleged in the petition that T. J. Taylor is the sole member of the firm. The machine in question was a new Jewett Super-Special. On Saturday, the 17th of May, 1924, T. J. Taylor made a trip to Virginia and did not return until the following Tuesday. In his absence his younger brother, Truman, then a regular assistant, had charge of the business. J. W. Taylor, father of T. J. Taylor, was also present. During the day Scott Preston, who worked at the Fordson Coal Company plant some two miles distant, negotiated with Truman for the purchase of this car, the result being the exe-

cution of a bill of sale for the car at the price of $1,390.00, the consideration being Preston's check for $63.00 then delivered, and a trade in of a new Ford coupe at the list price of $580.00, subject to an indebtedness of $180.00, which the Taylor Motor Sales Company agreed to assume and the agreement of Preston to pay the remaining $927.00 in monthly installments, the machine to remain the property of the Motor Sales Company; other matters being set out in great detail. This instrument was signed by Preston and attested by two witnesses, approved by Truman for the Motor Sales Company, and it, together with the check and coupe, was delivered to the company and Preston drove the new car to his home. It was stored that night in one of a number of private garages furnished by the Fordson Coal Company to its employes. Later a fire broke out in one of these and spread to the one in which this car was housed, destroying both.

In its answer, among other things, appellee relied on the following provisions of the policy:

"This policy shall cover, subject to the conditions and limitations herein contained only such autos—or chassis—or truck, including bodies, tops and equipment attached to or forming a part thereof owned by the insured, as or specifically declared by the insured and accepted by the company as hereinafter provided, only from the time of the acceptance of such risk by the company and while said property is in the actual possession of the assured or in the possession of a bailee of the assured at any location which is not excluded by the terms of this policy, provided, however, that nothing herein contained shall be construed (2) to extend the insurance upon any property beyond the day of its cancellation or other termination or (3) to cover any property in the hands of any purchaser under the partial payment plan."

The issue being as to whether Scott Preston had possession of the machine as a purchaser under the partial payment plan, or was merely a bailee.

Truman Taylor states that he lacked a few days of being twenty-one years of ageffi that he was not a partner, but worked regularly in the business and had charge during his brother's absence; that Preston

was willing to purchase the new machine at the list price of $1,390.00 but desired to put his Ford coupe in at its list price of $580.00, subject to an indebtedness of $180.00; he proposed for the Taylor Sales Company to assume this indebtedness and credit him by $400.00 on the purchase price of the new machine, he to pay $63.00 in cash and the balance on the new car in installments. Witness did not have authority to make a contract for deferred payments and did not know whether his brother would be willing to take the Ford coupe at list price, but agreed with Preston that the latter might leave his car and the $63.00 check, take the new car and return Monday morning and see his brother, T. J. Taylor; that he understood the trade to be conditional upon T. J. Taylor's approval and acceptance; that he drew up a bill of sale merely to fix the status of the parties in the event Preston should skip off with the machine. J. W. Taylor corroborated Truman in a way, but admits that he signed the bill of sale as a witness. This paper was also signed by another employe who heard none of the negotiations. T. J. Taylor states that he returned Tuesday morning; that Truman Taylor was not a partner in the business, nor authorized to make any deals, though he was with him and assisted in the business and was paid a salary. He heard of the fire on his return Tuesday morning and also learned that Preston had notified the bank not to pay his check. The check was in the office at the time, and he did not present this at the bank or return it. The Ford coupe was left in his garage, and later he let Preston have another Jewett special of the same type and model as the one destroyed, and accepted the Ford coupe as part payment thereon, but does not remember at what price it was credited. Scott Preston did not testify on the trial but later gave an affidavit in which he corroborated the statements of Truman Taylor. But it does not appear that he made any demand for a return of the coupe and check after the fire or at any time took any positive steps, indicating that he considered Taylor the owner of the car which was burned, except it is claimed that he stopped payment on the check.

It is well settled in this state that a conditional sale accompanied by a delivery of personal property passes the title to the purchaser with a lien to the seller for the unpaid purchase money, and the writing in question, accompanied by the delivery of the car, would prima facie constitute a sale.

On the other hand the evidence for appellant is positive that Truman Taylor was not authorized to make the sale in question and it was never intended or understood by the parties to become effective until approved by T. J. Taylor. However, the circumstances strongly militate against this contention. Truman Taylor was in charge of the business during his brother's absence All of the details of the transaction were carefully guarded by him, and it is hardly consistent with business dealing to permit a prospective purchaser to have full control of the purchased article before the consumation of the trade, and Truman's explanation of the bill of sale as being made in order to fix the status of the parties if Preston skipped with the machine is not convincing. The conduct of the parties after the fire appears even more strongly against this contention. If Preston had been only a prospective purchaser and not the owner of the car the natural thing for him to have done upon its destruction would have been to have at once called upon Taylor and to have asked a return of his check and coupe. It is not intimated that he did this or took any positive steps showing a denial of ownership, except to stop payment on the check. The Ford coupe remained in Taylor's possession and later on was traded in on a new car, the details of that trade not being shown.

Preston did not testify in this case and subject him self to cross-examination. Certainly these circumstances are sufficient to leave the mind in doubt as to the character of the trade, and in such cases this court is not inclined to overrule the opinion of the chancellor, who is presumed to have been acquainted with the parties and to have been able to judge of their credibility.

Wherefore the judgment is affirmed.